# AFFIDAVIT OF SPECIAL AGENT ERIC POALINO IN SUPPORT OF APPLICATION FOR CRIMINAL COMPLAINT

I, Special Agent Eric D. Poalino, having been sworn, state:

## INTRODUCTION AND AGENT BACKGROUND

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since June 2021. I am currently assigned to the Boston Field Office, North Shore Gang Task Force ("FBI Task Force"). The primary mission of the FBI Task Force is to identify, investigate, disrupt, and dismantle violent criminal organizations operating in cities north of Boston. My responsibilities include the investigation of possible violations of federal law, including illegal possession/transfer of firearms, firearms trafficking, narcotics trafficking, and violent crimes involving firearms and narcotics trafficking. I have received training and experience in various aspects of criminal law and procedure, including electronic and physical surveillance, interrogations, stops, searches, seizures, and arrests for a variety of criminal offenses. Through my training, knowledge, and experience, I have become familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in the use and trafficking of illegal firearms and narcotics, including persons involved in criminal organizations. My investigations have included the use of surveillance techniques and the execution of search, seizure, and arrest warrants.

2.     I have written and/or participated in the execution of numerous search warrants resulting in the seizure of controlled substances and paraphernalia involved in the manufacture and distribution of controlled substances; United States currency, records of narcotics and monetary transactions, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances, as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds. I have participated in

the debriefing of numerous defendants, informants and witnesses who had personal knowledge regarding large-scale narcotics trafficking organizations. I have participated in all aspects of drug investigations including conducting surveillance, executing searches pursuant to court-ordered search warrants, executing arrests, and participating in court-authorized Title III wiretaps of cellular phones.  I have received extensive specialized training in the field of controlled substance identification, investigation and enforcement.  Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store and transport narcotics and to collect, expend, account for, transport, and launder drug proceeds.

3. I make this affidavit in support of an application for criminal complaint and arrest warrant charging Krishna CASTILLO (dob: xx/xx/1991) with Possession of a Controlled Substance with Intent to Distribute, to wit: cocaine and methamphetamine, in violation of 21 U.S.C. § 841(a)(1), and Possession of Five or More False Identification Documents or Authentication Features with Intent to Unlawfully Use, in violation of 18 U.S.C. § 1028(a)(3).

4. Under Federal Law, a false identification document is "a document of a type intended or commonly accepted for the purposes of identification of individuals that" "is not issued by or under the authority of a governmental entity" and "appears to be issued by or under the authority of" "a State." 18 USC § 1028(d)(4). A counterfeit driver's license or identification card purportedly issued by a state is "a document of a type intended or commonly accepted for the purposes of identification of individuals." It is a violation of federal law to possess five or more false identification documents with the intent to use them.

5. All dates, time and amounts are approximate. Because this affidavit is being submitted for the limited purpose of securing the requested complaint and arrest warrant, I have not included each and every fact known to me concerning this investigation.

**PROBABLE CAUSE**

6. On January 23, 2023, investigators executed a series of search warrants at Apartment 433 located in 150 Heard Street, Chelsea, Massachusetts, which is the "One North" apartment complex (the "TARGET LOCATION"). The TARGET LOCATION was determined to be a premises that was fraudulently rented with a stolen identity.

**I.  THE INVESTIGATION OF APARTMENT 433**

7. On December 22, 2022, investigators reviewed lease documents for TARGET LOCATION. According to the documents, a rental application was electronically submitted, and a lease contract was executed on May 21, 2022. The rental application documents included a photo of a New Jersey (NJ) identification card in the name of O.R. (hereinafter the VICTIM).

8. The rental application listed "Protek Locating Inc" as VICTIM's employer and "utility locator" as his position within the company. A fraudulent W-2 in VICTIM's name was submitted with the rental application which contained a Social Security number (SSN) that did not match the VICTIM's true SSN. In the submitted documents, the VICTIM's 2021 gross income on the fraudulent W-2 was listed as $172,440.00.[1] Although the submitted W-2 listed the

---

[1] Federal tax withheld in the fraudulent W-2 was $14,093. This equates to roughly a 12% tax on the gross income, which investigators believe is implausible for the listed gross income. The gross income stated on the fraudulent W-2 submitted to the leasing company would generate a $14,370 per month in income. This is contradictory to the listed income for VICTIM on the rental application document which stated the income to be $937.50 per week (or $3,750 per month.) This equates to a $10,620 discrepancy in earned income between the figures listed on the rental application and the fraudulent W-2.

employer name as "Protek Locating Inc", the listed employee identification number on the W-2 was not associated with Protek Locating, and was in fact associated with a company based out of Sugarland, Texas. Below is the rental application for VICTIM along with the fraudulent W-2 are below:

| Financial | | | |
|---|---|---|---|
| Income Details | | | |
| Current Employer | | | |
| Employer Name: | PROTEK LOCATING INC | | |
| Address | 1037 51ST AVE LONG ISLAND CITY, NEW YORK 11101 United States | | |
| Income: | 937.50 | Position: | Ulitity locator |
| Started On: | 08/15/2015 | | |

4

| Copy B--To Be Filed With Employee's FEDERAL Tax Return | | OMB No. 1545-0008 | | Copy 2--To Be Filed With Employee's State, City, or Local Income Tax Return | | OMB No. 1545-0008 | |
|---|---|---|---|---|---|---|---|
| a. Employee's social security number ▮▮▮▮-427 | 1. Wages, tips, other compensation 172440.00 | 2. Federal income tax withheld 14093.16 | | a. Employee's social security number ▮▮▮▮-1427 | 1. Wages, tips, other compensation 172440.00 | 2. Federal income tax withheld 14093.16 | |
| b. Employer ID number (EIN) ▮▮▮▮2661 | 3. Social security wages 172440.00 | 4. Social security tax withheld 3700.80 | | b. Employer ID number (EIN) ▮▮▮▮2661 | 3. Social security wages 172440.00 | 4. Social security tax withheld 3700.80 | |
| | 5. Medicare wages and tips 172440.00 | 6. Medicare tax withheld 865.44 | | | 5. Medicare wages and tips 172440.00 | 6. Medicare tax withheld 865.44 | |
| c. Employer's name, address, and ZIP code PROTEK LOCATING INC. 1037 51ST AVE LONG ISLAND CITY, NY 11101 | | | | c. Employer's name, address, and ZIP code PROTEK LOCATING INC. 1037 51ST AVE LONG ISLAND CITY, NY 11101 | | | |
| NY | [state ID redacted] | 172440.00 | 3969.44 | NY | [state ID redacted] | 172440.00 | 3969.44 |

9. A Google search of Protek Locating Inc, as listed on the rental application and W-2, produced an image of a residential building. The Google search also showed the Protek Locating Inc to have two Google reviews, and a Facebook page associated with the business has 16 likes and 16 followers, all of which are hidden from view.

10. The rental application as well as the lease contract bore the purported electronic signatures of VICTIM and an individual I will refer to as P.S. for a lease term of one year, May 22, 2022 – May 20, 2023. The lease contract specified a $3,658.00 per month rent, not including utilities and other services, which per the lease contract, were to be paid to the landlord which is an entity known as ONE NORTH. Throughout the lease contract, the VICTIM's name and initials are purported to be electronically signed, agreeing to the terms of the lease contract.

11. For identification purposes, investigators attempted to call the phone number for VICTIM that was submitted on the rental application for TARGET LOCATION. The phone

number (ending in 7541) was a non-working number. Massachusetts Department Criminal Justice Information Services (CJIS) as well as ACCURINT, a commercially available public records database, indicated that the VICTIM still resided in New Jersey. A working phone number for the VICTIM was obtained, at which point a telephone interview was conducted with VICTIM by investigators. Prior to the interview, VICTIM confirmed his identity, verifying his name, date of birth, address, Social Security number, driver's license number, as well as his physical features and attributes. This was a precautionary measure by investigators to confirm VICTIM was in fact O.R. and to further solidify he was associated with the TARGET LOCATION.

12.     During the interview, VICTIM stated he has never visited Massachusetts, has never applied to rent any property in Massachusetts, was not renting any residential property in Massachusetts, and has not authorized any individual to utilize his personal information for purposes of renting, or leasing any apartment. VICTIM stated he lost his NJ identification card in the recent past and never recovered it. VICTIM stated he does not remember where, or when he lost his NJ identification card. VICTIM stated he has never worked for Protek Locating Inc. and furthermore has never heard of the company.

13.     Investigators interviewed the Senior Community Manager and the Assistant Community Manager (THE MANAGERS) of ONE NORTH, whose identities are known to investigators. THE MANAGERS are responsible for leasing and all day-to-day operations at ONE NORTH. During this interview, THE MANAGERS stated the following:

   a. VICTIM has never been seen by THE MANAGERS in the apartment complex, nor have they electronically, or telephonically communicated. THE MANAGERS have seen a female party whom they believed to be P.S. a couple of times, but the majority of time they have witnessed a female they do not recognize as well as multiple children associated with TARGET LOCATION.

b. P.S. advised THE MANAGERS that the unknown female is a nanny to the children residing in TARGET LOCATION.

c. Eviction proceedings against VICTIM have commenced for non-payment, property damage, as well as other violations of the lease contract. Neither VICTIM nor P.S. have replied to the eviction notices. A female party who identified herself as P.S. contacted THE MANAGERS on October 12, 2022, requesting all contact information for TARGET LOCATION be sent to krishcastillo@gmail.com.

d. Upon executing the lease, P.S. was issued two key fobs for entry into ONE NORTH.

e. P.S. recently contacted THE MANAGERS requesting additional key fobs, stating she had lost the two given to her. THE MANAGERS refused to provide additional key fobs as eviction proceedings were underway.

f. In addition to key fobs, ONE NORTH utilizes a keyless entry system in which residents may type a passcode into a cell phone application associated with their respective apartment numbers. This passcode will unlock the exterior door to ONE NORTH. An account within the application utilizing the resident's identifiable information with their proper associated apartment number is required to utilize the keyless entry system. Any time this phone application is used to enter ONE NORTH, time of entry along with the associated account is recorded into an internal database accessible by THE MANAGERS. Within this database, P.S. has two phone numbers that are being used to gain entry into ONE NORTH.

g. Corresponding surveillance footage in the lobby of ONE NORTH to P.S.'s keyless entry account being used to enter captured CASTILLO entering the TARGET LOCATION multiple times:



    h.  Juveniles are also observed on surveillance footage entering ONE NORTH utilizing P.S.'s keyless entry account that are believed to be CASTILLO's children.

    i.  There is no surveillance footage depicting the VICTIM entering ONE NORTH.

## II.   THE SEARCH OF APARTMENT 433

14.    Investigators executed a search warrant for the TARGET LOCATION on January 23, 2023. Once investigators gained entry into TARGET LOCATION, two juvenile females and one adult female were encountered. The adult female will be referred to as A.F. The juveniles as well as A.F. stated that: (1) no other individuals were present, (2) that TARGET LOCATION belonged to CASTILLO, and that CASTILLO has been away at work for approximately a week and a half. The juveniles identified themselves as the daughters of CASTILLO.

15. Investigators began searching TARGET LOCATION and quickly observed a significant amount of a hard white substance that based on the collective training and experience of the investigators present, was believed to be crack cocaine. The suspected crack cocaine was in cellophane packaging and located in a small mesh basket on a shelf in the closet of the master bedroom (Bedroom E). The closet of Bedroom E does not have a door or barrier of any kind. Instead, it is an open portion to the bedroom itself. In Bedroom E, investigators also located a small blown out baggy with a hard white/yellow substance, a small glass vial containing a hard white/yellow substance, white residue in numerous plastic baggies, white residue in a trash bag, a digital scale with white residue, materials consistent with the packaging and sale of drugs/narcotics, and a Glock firearm carrying case.

16. Investigators immediately stopped the search and obtained an expanded search warrant authorizing the seizure of drug and firearm items.

17. Investigators located numerous items in Bedroom E that belonged to CASTILLO including paperwork with her name on it such as credit card applications, tax documents, and her U.S. Passport. Bedroom E also contained a significant amount of women's clothing, footwear, and accessories including high value items such as Gucci shoes, Louis Vuitton purses, and Cartier sunglasses. According to the juveniles, Bedroom E is where CASTILLO slept.

18. In a closet within the den was a backpack. Inside the backpack was a high capacity feeding device/Glock magazine.

19. In total, investigators located 16 identification cards/driver's licenses in the TARGET LOCATION. Thirteen of the counterfeit driver's licenses contained the same exact picture of P.S.; one counterfeit driver's license contained a picture of another female associate of CASTILLO who I will refer to as C.A.; and two counterfeit driver's licenses contained the image

of Krishna CASTILLO. Each counterfeit driver's license had different personal identifying information ("PII") on it and were purported to have been issued by various states throughout the United States. The driver's licenses and identification cards appear legitimate to the naked eye as they contain the security measures such holograms, barcodes, and the proper texture etc.

20.     Still images of the two counterfeit driver's licenses bearing CASTILLO's photograph follow:



21.     The victims whose PII was located on the counterfeit driver's licenses were identified as residing in states across the country, such as New Hampshire, Maine, Connecticut, Rhode Island, Alabama, Kansas, and Nebraska.

22.     The suspected controlled substances recovered from the TARGET LOCATION were analyzed at the Massachusetts State Police Crime Laboratory. One bag contained a white rock-like powder that was determined to contain cocaine, and weighed 117 grams.

23.     Investigators conducted an interview with A.F. who reported the following in sum and substance:

    a. A.F. is from Bani in the Dominican Republic which is a town near Santo Domingo. A.F. illegally crossed the Mexican-United States border in mid-December of 2022. After being processed by immigration services, she flew to Boston around December 19, 2022. A.F. knew CASTILLO and her family from Bani. CASTILLO invited SANCHEZ to the United States and promised her a job as a nanny when she arrived.

b.  A.F. was currently staying at CASTILLO's residence in Apt. 433 while providing childcare for CASTILLO's two children. A.F. first started living at Apt. 433 on January 18, 2023. While living there she was responsible for taking care of the dog, children, and apartment. No other adults visited the residence while A.F. lived there. A.F. knew that the only adult who permanently resided at Apt. 433 was CASTILLO. According to A.F., CASTILLO rented the apartment and was the mother of the two children.

### III.  FURTHER REVIEW OF INFORMATION FROM CASTILLO'S PHONE

24. Through this investigation and review of information derived from CASTILLO's cellular phone, investigators have learned that Krishna CASTILLO engages in large-scale identity theft, fraud, and theft utilizing counterfeit identifications. This fraud takes place across the country and has resulted in at least $150,000 in losses that have been identified thus far.

25. For example, the counterfeit driver's licenses recovered from the TARGET LOCATION on January 23, 2023, are known to contain the PII of active legitimate customers for Verizon Wireless, (the "Wireless Company"). The photographs on these counterfeit driver's licenses were those of CASTILLO, P.S. and C.A, but the PII belonged to the customers of the Wireless Company. The PII listed on the counterfeit identifications were later queried and determined to be associated with cellular phone accounts that had been subject to a fraudulent scheme known as an account takeover.

26. After speaking with an investigator from the Wireless Company and then reviewing the contents of CASTILLO's cellular phone and other cellular phones, investigators learned that CASTILLO, P.S., C.A., and other associates of CASTILLO utilize the counterfeit identifications to pose as the individual listed on the card and conduct an account takeover. Investigators requested information from an investigator with the Wireless Company about any losses associated with accounts in the names of the stolen PII listed on the sixteen counterfeit identifications recovered from the TARGET LOCATION on January 23, 2023. The Wireless Company reported

over $150,000 in total losses for cellular phones and other items purchased from the accounts associated with the sixteen individuals whose PII was listed on the counterfeit driver's licenses.

27. The investigator with the Wireless Company reported that all of the more than $150,000 in losses were associated with account takeover schemes. The investigator described an account takeover scheme as follows:

   a. An individual enters a store for the Wireless Company and claims to store personnel that they have lost their phone.

   b. The individual claims to be the account holder and presents an identification in the name, address and date of birth of the account holder, but bears the photograph of the individual in the store. Because their phone is claimed to be lost, the Wireless Company cannot initiate a two-factor authentication by sending a message to the cellular device.

   c. The individual then purchases a replacement phone and other products and elects to charge the purchase to the account, to be paid-for over time as part of the monthly bill. Often these purchases are new and top-of-the-line Apple iPhones and Samsung cellular phones that cost upwards of $1,000 each. The investigator stated that company policy requires the presentation of government issued identification from the customer in order to conduct the types of transactions that cause charges to be made to the account, such as the purchase of a new cellular phone.

   d. The individual exits the store with the newly purchased cellular phone and products without having had to expend any money, except potentially taxes or small incidental costs. The newly purchased cellular phone is provisioned to the

account holder's phone number, and the account holder's phone number is now associated with the device(s) obtained by the individual who stole their identity.

e. Generally, within a short period of time, the true account holder contacts the Wireless Company to report the fraud. This generally arises because the true account holder no longer has access to their phone number. Upon verifying the true identity and fraudulent nature of the transaction, the Wireless Company deactivated the newly purchased phone, lists it as stolen, and "blacklists" the device from activation on U.S. based cellular networks.

f. Despite being blacklisted, cellular networks in other countries will activate those devices. Additionally, investigators are aware that stolen and blacklisted cellular devices, especially newer models, can be sold to dealers in other countries at significant profit despite their questionable origin.

28. As noted above, investigators reviewed data from CASTILLO's cellular phone, and other cellular phones utilized by coconspirators. Review of that data revealed the following concerning the account takeover scheme:

a. CASTILLO obtains the stolen PII and additional information about the customer including the customer's telephone number, account PIN, last four of the SSN for the stolen identity, and current make and model of phone active on the account.

b. CASTILLO coordinates the execution of the fraudulent scheme, and oversees the logistics of travelling to stores throughout the county to conduct the scheme.

c. CASTILLO coordinates the transportation and sale of the stolen devices overseas and had lists of cellular devices and sale prices from these foreign dealers.

d. CASTILLO herself coordinates and pays for the stolen PII receiving the information digitally through her cellular phone.

13

e. Once in possession of the stolen PII, CASTILLO then coordinates the creation of the counterfeit identification card bearing the stolen PII and provides the photograph of the associate who will be conducting the actual fraud. CASTILLO also provides payment to the associates who create the counterfeit driver's licenses.

f. Investigators located hundreds of additional stolen identities that CASTILLO has obtained. All of the stolen identities appear to be customers of the Wireless Company. These additional identities are being queried and losses associated with the additional stolen identities are not included in the $150,000 figure listed above.

g. Investigators located conversations between CASTILLO and other conspirators in the scheme discussing the operation of the scheme, such as: the source of the stolen PII; generation of the counterfeit identifications containing the stolen PII; logistics for travel to other parts of the country to conduct the scheme; payment for expenses; and monetization of the stolen devices.

  i. For example, investigators reviewed a text message conversation taking place on October 31, 2022. In the text message conversation, a coconspirator (CC-1) informs CASTILLO that they will be returning from Kansas because the counterfeit identifications are not working ("dese shits ain't hitting" "Niggas ain't hitting shit w dese ids"). CASTILLO responds that she has new counterfeit identifications ("I got new ones") and that she will keep working with P.S. while CC-1 can return home. The excerpt of this conversation follows:

| Author | Content |
| --- | --- |
| CC-1 | We gon drive back to Kansas n buy tickets from kansas |
| CC-1 | Cuz dese shits ain't hitting |
| CC-1 | I dun drove across da world |
| CC-1 | N Niggas ain't hitting shit w dese ids |
| CASTILLO | i got new ones ima go n keep working with [P.S.] u can come home |
| CC-1 | Word snm |

h. Investigators located "Notes" generated by CASTILLO that appear be lists of stolen devices and products obtained through the scheme that CASTILLO had generated and saved. The Notes also list amounts to be paid to other conspirators, including P.S. and others.

i. Investigators located photographs of Apple packaging that appears to depict the boxes for the fraudulently obtained cellular devices.

j. Investigators also located photographs of dozens of additional counterfeit driver's licenses and identifications bearing stolen PII. A number of these counterfeit driver's licenses bore CASTILLO's photograph, which is the same photograph as depicted on the counterfeit driver's licenses recovered from the

14

TARGET LOCATION. Still images of some of the counterfeit licenses bearing CASTILLO's photograph follow:






15








29. Investigators also reviewed text messages where CASTILLO discusses the distribution of controlled substances, demonstrating her possession, and intent to distribute the cocaine located in the TARGET LOCATION. Two examples follow.

        a. On December 28, 2022, CASTILLO sent text messages to a conspirator (CC-1) directing them to conduct a drug transaction ("jug"). The excerpt of this text message conversation follows:

16

| Author | Content |
|---|---|
| Incoming | yooooo |
| Incoming | i got a jug |
| Incoming | address |
| Incoming | i sent him this one |
| Incoming | 2 Lynn Fells Pkwy<br>Stoneham, MA  02180<br>United States |
| Incoming | so meet him there |
| Incoming | he's 40 mins away |

b. On November 1, 2022, CC-1 instructed CASTILLO to distribute drugs. CC-1 tells CASTILLO that an associate has arrived and to provide the associate with 388 grams ("Give him 388"). CC-1 then tells CASTILLO that he is going to give another associate named "Jake" four "ropes", which are believed to be ounces (which totals 112 grams). Investigators believe that the amount being in ounces signifies that the transaction is for cocaine. CC-1 tells CASTILLO to put the 112 grams (the four ropes) aside for Jake ("N put the 112 aside fa dis lil nigga"). Collectively, the 388 grams and 112 grams equate to a total of 500 grams, which is half of kilogram. The excerpt of this text message conversation follows:

| Date | Author | Content |
|---|---|---|
| 11/1/2022 1:14:14 AM(UTC+0) | CC-1 | He's there |
| 11/1/2022 1:14:28 AM(UTC+0) | CASTILLO | oky |
| 11/1/2022 1:15:07 AM(UTC+0) | CC-1 | Give him 388 cuz ima give Jake 4 ropes |
| 11/1/2022 1:16:07 AM(UTC+0) | CC-1 | U heard |
| 11/1/2022 1:16:48 AM(UTC+0) | CC-1 | N put the 112 aside fa dis lil nigga |
| 11/1/2022 1:17:25 AM(UTC+0) | CASTILLO | side door baby |
| 11/1/2022 1:17:32 AM(UTC+0) | CC-1 | Make sure it's on the dot bro |
| 11/1/2022 1:18:10 AM(UTC+0) | CASTILLO | i'm not crazzy |
| 11/1/2022 1:18:38 AM(UTC+0) | CC-1 | Bet Jake on his way also |
| 11/1/2022 1:18:52 AM(UTC+0) | CC-1 | Tell him come to the side door nowv |

## CONCLUSION

30. Following the execution of the search warrant on January 23, 2023, investigators applied for a criminal complaint charging CASTILLO with state criminal offenses related to trafficking in controlled substances, and the counterfeit identifications. See Chelsea District Court, Docket No. 2314CR00282. A criminal complaint issued by summons, with arraignment scheduled for March 23, 2023. CASTILLO failed to appear at the arraignment and entered warrant status on March 23, 2023. She was apprehended by Massachusetts State Police on November 29, 2023.

17

31.     Based on the foregoing, there is probable cause that Krishna CASTILLO has violated 21 U.S.C. § 841(a)(1), by possessing controlled substances with intent to distribute, and 18 U.S.C. § 1028(a)(3), by possessing five of more false identification documents with intent to unlawfully use them.

Sworn to telephonically in accordance with Federal Rule of Criminal Procedure 4.1 on January 3, 2024.

*Eric Poalino*
Eric D. Poalino
Special Agent, Federal Bureau of Investigation

Electronically sworn to and subscribed telephonically in accordance with Federal Rule of Criminal Procedure 4.1 on January 3, 2024.

*Jennifer C. Boal*
Hon. Jennifer C. Boal
United States Magistrate Judge